UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| ERIC J. PAYNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | CIVIL NO: 5:07-CV-162 |
| | § | Judge Folsom/Judge Everingham |
| | § | |
| JOHN McHUGH, Secretary of the Army, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT JOHN McHUGH'S REPLY TO
PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ON DISCRIMINATION AND RETALIATION CLAIMS**

The issue on summary judgment is simply if there is a triable issue of fact as to whether the Army terminated Payne for a wrong reason — because he was disabled or because he had filed a (facially frivolous) EEO age complaint. Trial in this case would be pointless because the undisputed evidence shows that Payne was not disabled under the Rehabilitation Act and that he was removed as a firefighter at the Depot because he tested positive for THC as part of a random drug test. Plus, the undisputed evidence shows that the relevant decisionmakers did not even know that Payne had filed an age complaint, so they could not have retaliated against him for filing one, and simply too much time passed between Payne's filing of the age complaint and his termination to raise any inference of retaliation. The Army makes the following points in reply to Payne's Response (doc. 59):

1.   **Payne has abandoned the reassignment and reporting claims.**

Payne originally contended that the Army discriminated and retaliated against him by reassigning him to a non-driving firefighter position in March 2006 (the "reassignment claim") and that it retaliated against him by allegedly reporting "false" information about him to the Texas EMT Board (the "reporting claim"). After the Army pointed out that Payne never administratively exhausted those claims, Payne now contends that they are not separate claims at all but rather "additional evidence" supporting his termination claim. Response 5. Payne has thus abandoned the reassignment and reporting claims as freestanding acts of discrimination or retaliation.

2.   **Payne fails to raise a fact issue as to whether he was disabled.**

Under the law, whether an alleged impairment substantially limits a major life activity turns on the impairment's nature and severity, its duration or expected duration, and its permanent or long-term impact. *Dupre v. Charter Behavioral Health Sys.*, 242 F.3d 610, 614 (5th Cir. 2001) (citing 29 C.F.R. § 1630, App. § 1630.2(j)). Payne bears the burden of showing that his alleged impairments substantially limited a major life activity. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 644 (2nd Cir. 1998).

Payne asserts that he began to experience sleep deprivation, nausea, and anxiety in December 2004, but his conclusory statement that he experienced these symptoms on a "continual basis for several years," Response 5, is simply not supported by the evidence he cites. Indeed, in the very next sentence Payne admits that he had panic attacks (which brought on his symptoms) only "occasionally" and that when he had them they would only

last from "two minutes to several hours." *Id*. That Payne only had occasional panic attacks and experienced symptoms as a result does not mean that he was disabled under the Rehabilitation Act. *See Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 656-57 (5th Cir. 2003) (occasional flare-ups of chronic pancreatitis that caused plaintiff to miss work did not qualify as a disability); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) ("We have previously rejected attempts to transform temporary afflictions into qualifying disabilities").

Plus, the symptoms Payne describes (sleep deprivation, nausea, and anxiety) are just that — symptoms; to qualify as a disability, however, Payne must show not only that he had an impairment and accompanying symptoms, but he must demonstrate how the symptoms *substantially limited* him from performing a major life activity. *See Kourianos v. Smith's Food & Drug Ctrs., Inc.*, 65 Fed. Appx. 238, 241 (10th Cir. May 6, 2003). Payne claims that he "was substantially limited in the major life activities of sleeping, eating, and breathing." Response 6. But none of these impairments were of the severity or duration required to constitute a disability under the law.[1]

With respect to sleeping, Payne's own doctor (Dr. Chandler) testified that Payne generally had no problems with sleep. Chandler Depo. (Ex. C to MSJ) 102:13-15. Nevertheless, Payne says that he "once went without sleep for three or four days." Response 6. That Payne *once* had a three-to-four day spell where he could not sleep falls

---

[1] Payne also asserts that Dr. Chandler diagnosed him with having a generalized anxiety disorder in March 2006, Response 6, but it is not enough for a plaintiff "to merely submit evidence of a medical diagnosis of an impairment." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002).

Defendant's Reply Brief — Page 3

far shy of showing that he was *substantially limited* in the major life activity of sleeping in any permanent or long-term way. *See Carter v. Ridge*, 255 Fed. Appx. 826, 830 (5th Cir. Nov. 19, 2007) (to establish a substantial limit in the major life activity of sleeping, a plaintiff must "present evidence, beyond vague assertions of a rough night's sleep or a need for medication, that his affliction is worse than that suffered by a large portion of the nation's adult population") (quoting *Nadler v. Harvey*, 2007 WL 2404705, at *6 (11th Cir. Aug. 24, 2007)); *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 757 (7th Cir. 2006) (plaintiff failed to show substantial limitation of major life activity of sleeping where she provided no medical records or other evidence showing how sleep disruptions affected her ability to function in daily life); *Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006) (evidence of intermittent disrupted sleep "cannot establish the type of prolonged, severe and long-term sleep difficulties that can amount to a substantial limitation in the major life activity of sleeping").

As for eating, Payne says only that at some point (when, or over what period, he does not say) he lost over 30 pounds. Response 6. But even if Payne lost weight at one point in his life does not mean that he was substantially limited in his ability to eat. The undisputed summary-judgment evidence establishes that Payne was a voracious eater. *See* Miller Depo. (Ex. G to MSJ) 36:10-16 (testifying that Payne "definitely" had no problems eating and that he was "always eating snack food"); Dinsmore Depo. (Ex. F to MSJ) 54:10-14) (testifying that Payne "always ate"). Moreover, Jackie Payne said that Payne was able to eat when he took his medication, so his eating could not have been substantially limited

as a matter of law.  J. Payne Depo. (Ex. AA to Reply) 147:9-10; *Sutton v. United Air Lines*, 527 U.S. 482, 483 (1999) ("A person whose physical or mental impairment is corrected by [mitigating] measures does not have an impairment that presently 'substantially limits' a major life activity").

Finally, although Payne testified that he had no problems with his breathing while working at the Depot, Payne Depo. (Ex. A to MSJ) 60:15-17, he claims that he sometimes had problems breathing during a panic attack.  Response 6.  But he admits that he had these attacks only "occasionally," *id*. at 5, which is consistent with his doctor's testimony that the attacks were rare.  Chandler Depo. (Ex. C to MSJ) 102:16-23.  Indeed, Payne identifies *only two attacks* that he had over the course of his five-plus years at the Depot, Response 7, and the evidence shows that Payne was able to quickly recover his breathing after these attacks.  Payne Depo. (Ex. A to MSJ) 152:23-153:4; Miller Depo. (Ex. G to MSJ) 35:22-36:9.  Even the evidence cited by Payne shows that he was able to get control of his breathing within mere minutes of a "severe" attack he claims to have had in early March 2006.  Response 6 (citing Parker Statement at Ex. I to Response).  The infrequent, temporary panic attacks Payne had simply do not qualify as disabilities under the Rehabilitation Act.  *See Zirpel v. Toshiba Am. Info. Sys., Inc.*, 111 F.3d 80, 81 (8th Cir. 1997) (plaintiff not disabled as a matter of law where he had problems breathing and speaking during panic attacks but such attacks were infrequent).

Moreover, the Fifth Circuit has held that "the relevant time for assessing the existence of a disability is the time of the adverse employment action." *E.E.O.C. v.*

*Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 618 (5th Cir. 2009). Because Payne's termination resulted from his failed drug test, the relevant time here is May 31, 2006, the date of the test. The undisputed evidence establishes that Payne was not disabled then, when the Army proposed his removal on July 3, 2006, R. 165-66, or at any other time. On April 11, 2006, Payne went to see Dr. Patricio Andres at the Depot clinic to be cleared for duty. Dr. Andres noted that Payne appeared "well, calm, rational, [and] cooperative" with no "abnormal physical signs of his anxiety disorder." April 11, 2006 Medical Notes (Ex. X to MSJ). Payne himself told Dr. Andres that he felt "better than ever before" at that point, *id.*, and he testified that from April 11, 2006 until the time of the drug test "things were looking pretty promising from my point of view[.]" HT 211:3-11. Thus, the evidence conclusively shows that Payne was not disabled within the meaning of the Rehabilitation Act at the relevant time (or ever). Because Payne was not disabled, he cannot make out a prima facie case of disability discrimination, so the Army is entitled to summary judgment.

3.  **Payne's regarded-as-disabled claim is relevant only to his now-abandoned reassignment claim, and the Army did not regard Payne as disabled anyway.**

Payne alleges that Assistant Fire Chief Dinsmore perceived him as disabled in March 2006 by moving him to a non-driving firefighter position at Fire Station No. 2.[2] *See* Am. Compl. (doc. 23) ¶ 34. This regarded-as-disabled claim is moot in light of Payne's concession that his claim for disability discrimination stems solely from his termination as

---

[2] Though Payne characterizes Fire Station No. 2 as a "backup station" to Fire Station No. 1, Response 9, he himself admits that the duties at the two stations were "basically the same." Payne Depo. (Ex. A to MSJ) 19:17-23. And there is no dispute that even after Payne was temporarily moved to Fire Station No. 2 in March/April 2006 Payne kept all of his basic firefighting duties except for driving. Response 8-9; Dinsmore Depo. (Ex. F to MSJ) 53:20-54:4.

Defendant's Reply Brief — Page 6

opposed to the reassignment — Payne never alleges that Larry Ford, who made the *termination* decision, ever regarded Payne as disabled.

But Payne's regarded-as-disabled theory fails on the merits anyway. He claims for the first time in his Response that Fire Chief Pagley and Assistant Chief Dinsmore "believed Payne was substantially limited in his ability to think and concentrate," but his evidence and briefing supports only the notion that those supervisors were concerned about Payne's ability to safely drive a fire truck, not his ability to think and concentrate. *See* Response 8-9.[3] Payne's supervisors temporarily moved Payne to a non-driving firefighting position in March/April 2006 after they received an e-mail from one of Payne's fellow firefighters expressing concerns about Payne's ability to control his stress while driving and after Payne's own doctor wrote a note saying that Payne was experiencing panic attacks at the time (had they not done so the Army might have found itself susceptible to a negligence lawsuit). *See* Exs. T, U to MSJ; Dinsmore Depo. (Ex. F to MSJ) 52:11-19; *Bennett v. Calabrian Chems. Corp.*, 324 F.Supp.2d 815, 833 (E.D. Tex. 2004) (employer cannot be viewed as improperly regarding employee as disabled if the employer's belief aligns with the employee's physician's own description of the employee's limitations). Simply because Payne's supervisors made the decision that Payne was unable, temporarily, to perform one particular task — that of driving — with an adequate margin of safety does not mean that they regarded him as disabled. *See Chandler v. City of Dallas*, 2 F.3d 1385, 1390 (5th Cir. 1993); *Wyland v. Boddie-Noell Enters., Inc.*, 165 F.3d 913, 1998 WL

---

[3] Moreover, Payne wholly fails to demonstrate, as he must, that the alleged impairment(s), "if it existed as perceived, would be substantially limiting." *Dupre*, 242 F.3d at 616.

Defendant's Reply Brief — Page 7

795173, at *2 (4th Cir. Nov. 17, 1998) (employer did not regard employee as disabled by being concerned about his ability to safely operate a car).

4. **Payne gets the causation standard wrong for a disability-discrimination claim under § 504 (29 U.S.C. § 794) of the Rehabilitation Act.**

Under Fifth Circuit precedent, "federal employees may bring disability discrimination claims against the Government under either § 501 or § 504 of the Rehabilitation Act (29 U.S.C. §§ 791 & 794)." *Pinkerton v. Spellings*, 529 F.3d 513, 515 (5th Cir. 2008). Payne chose to sue under § 504. *See* Am. Compl. (doc. 23) ¶ 33 (citing 29 U.S.C. § 794(a)) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subject to discrimination"). The settled causation standard for a § 504 claim is whether the plaintiff was discriminated against "solely by reason of" his disability. *See Pinkerton*, 529 F.3d at 516. This is the standard Payne cited in his live pleading and in the Joint Conference Report in this case. *See* Am. Compl. ¶ 33; Joint Conference Report (doc. 35) p. 2. Payne now claims that "motivating factor" is the correct standard, Response 9, but that is the standard that applies to § 501 claims. *Pinkerton*, 529 F.3d at 519. Because Payne pleaded a § 504 claim and not a § 501 claim, "solely by reason of" is the standard that applies to this case. *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002).

5. **Payne cites no evidence that he was taking Marinol close enough to the May 31, 2006 drug test such that Marinol caused him to test positive for THC.**

Though Payne boldly proclaims that he has produced "overwhelming evidence that the positive drug test was caused by his prescription medication," Response 10, the fact is

that he cites no evidence whatsoever on the key issue: whether he was taking Marinol at or near the time of the May 31, 2006 test. Instead he points to a number of irrelevant, and in some cases, misleading, facts. Payne says, for example, that:

1) He gave the MRO a copy of the December 2004 Marinol bottle label. Resp. 10.

True, but all this proves is that Dr. Chandler prescribed Marinol for Payne back in December 2004, a point that is not in dispute.

2) He gave the MRO a note dated June 23, 2006 from Dr. Chandler "that confirmed [Payne's] recent treatment with Marinol." Resp. 10.

But the note actually said that Payne was "currently" being treated with Marinol as of the date of the note — *June 23, 2006*. R. 248. Not only did the note fail to address the only important question — whether Payne was taking Marinol at the time of the *May 31, 2006* drug test — but the note did not even tell the truth, as Jackie Payne admits, because Payne did not have any Marinol pills left by the time the June 23, 2006 note was written (nor did he even have any left at the time of the May 31 drug test). J. Payne Depo. (Ex. B to MSJ) 120:1-8; 123:17-20. And Dr. Chandler said that had he known that Payne had actually run out of pills by June 23, 2006 he "probably" would not have written the note. Chandler Depo. (Ex. C to MSJ) 80:3-24.

3) Dr. Chandler allegedly gave Payne a "prescription" for Marinol on March 21, 2006. Resp. 10.[4]

---

[4] Throughout this case Payne has claimed that he was given a second Marinol prescription, but he has never produced it (because it does not exist). Though Payne now claims that Dr. Chandler wrote Payne the phantom "second prescription" on March 21, 2006, Response 10, he stated in his interrogatory answers that Dr. Chandler issued the "prescription" on March 8, 2006. *See* Answer to Interr. No. 22 (Ex. I to MSJ).

Defendant's Reply Brief — Page 9

But Dr. Chandler's March 21, 2006 medical notes do not show that Payne was "prescribed" Marinol at that time; Marinol is simply one of the drugs listed in the notes.[5] Dr. Chandler testified that as of March 21, 2006 he did not even know if Payne had any Marinol pills left over from his old December 2004 prescription and that those pills should have been gone since January 2005. Dr. Chandler Depo. (Ex. BB to Reply) 76:5-21. And there is no dispute that Dr. Chandler never wrote Payne a second Marinol prescription to take to the pharmacy or that Payne has only filled one Marinol prescription in his lifetime — in 2004. J. Payne Depo. (Ex. B to MSJ) 120:20-22; Answer to Interr. No. 22 (Ex. I to MSJ).

    4)    Depot clinic notes from March 24, 2006 show that Payne was taking Marinol at that time. Resp. 10.

Not so. All the clinic notes show is that Payne had historically been treated with Marinol to control his anxiety. *See* Ex. W to MSJ. And even if the notes did show that Payne was taking Marinol at the time of the March 24 exam, then that is all they show. Importantly, they fail to indicate that Payne was taking the drug at the time of the May 31, 2006 drug test. Payne neglects to mention that Depot clinic notes from April 11, 2006 — still some six weeks before the drug test — show that Payne was taking Wellbutrin and Xanax, but not Marinol, when he went to see Dr. Andres for a follow-up exam. *See* April 11, 2006

---

[5] Among the many oddities in this case is the fact that Payne was somehow able to produce selected bits of his "chart" from Dr. Chandler's files, *see* Ex. N to Response, even though Dr. Chandler testified that he lost the chart. Chandler Depo. (Ex. C) 8:13-18; 9:13-19; 11:24-12:2; 13:3-6. It bears mentioning also that Payne never gave the notes he attaches as Exhibit N to his Response to the MRO or anyone at the Depot *before the removal decision was made*. *See generally* HT 67-71. They were only produced afterward, during the MSPB process.

Medical Notes (Ex. X to MSJ). Not only was Payne likely out of Marinol pills by April 11, but from then until the time of the May 31, 2006 drug test, Payne said that he was feeling "better than ever before" and that "things were looking pretty promising," so there was no need for him to take Marinol — a drug he didn't like to take because it made him feel "euphoric" and "not in control" — before the drug test. *See id.*; HT 196:8-14; 211:3-11.

     5)     Fire Chief Pagley and Assistant Chief Dinsmore "saw pills in the bottle of Marinol that Payne brought to them on June 29, 2006." Resp. 10-11.

This is misleading. Pagley and Dinsmore actually testified that Payne brought a bottle to the meeting but that they did not know what was in it. Pagley Depo. (Ex. BB to Response) 32:5-8; Dinsmore Depo. (Ex. X to Response) 40:1-6. Payne tellingly cites to no *evidence* showing that whatever (if anything) was in the bottle was *Marinol*. And he cannot do so because the undisputed evidence shows that his Marinol pills were gone by then (and he never got more pills). J. Payne Depo. (Ex. B to MSJ) 120:1-8; 20-22 (testifying that Payne did not have any Marinol pills left at the time of the May 31, 2006 drug test and that the Marinol pills Payne got back in December 2004 were the only ones he ever had).

     Thus, Payne has failed to create a triable fact issue as to whether he violated the Army's no-tolerance drug policy because he cites to no evidence — no declaration, no deposition testimony, nothing — that he was taking (or even had any) Marinol at or near the time of the May 31, 2006 drug test. The undisputed evidence conclusively proves that it would have been impossible for Marinol to have been the cause of the positive test result. Dr. Cametas testified that Marinol will only stay in the system for three days to two weeks.

HT 70:16-20.[6]  Payne, however, exhausted his Marinol supply by (at latest) the second week of April 2006.  J. Payne Depo. (Ex. B to MSJ) 120:1-8.  So the drug would have been completely out of his system by mid-to-late April, still *over a month before* the drug test at the tail end of May.  Thus, whatever drug did cause the positive result (almost certainly it was marijuana),[7] it was not Marinol.[8]

**6.     Payne cannot make out a prima facie case of retaliation.**

Payne's retaliation claim fails for a simple reason: he offers no evidence connecting any adverse employment action he suffered with his filing of an EEO age complaint in February 2005.  He fails to refute the Army's evidence that none of the relevant decisionmakers at the Depot's personnel department (Johnnie High, Ivaria Bursey, or Earldine Yarber) or the fire department (Chief Pagley or Assistant Chief Dinsmore) even

---

[6] While Dr. Cametas testified that Marinol could stay in the system for as long as six weeks for a chronic user, HT 70:18-22, Payne could not possibly have been a chronic user anywhere near the time of the May 31, 2006 drug test — by his own account he simply didn't have enough pills (he only had a 12-day supply to use from December 27, 2004 to May 31, 2006).  *See* Answer to Interr. No. 22 (Ex. I to MSJ).

[7] The undisputed evidence shows, after all, that marijuana has been in Payne's life for a long time.  He was first arrested for possessing the drug in 1987; he was kicked out of the Navy as a firefighter for admittedly using marijuana in 1993; and he was again arrested for marijuana possession in 2000.  *See generally* MSJ (doc. 54) 2-3.  If it really were true, as Payne claims, that he only used marijuana "once in the early nineties," Response 4, then it is strange why, in 1993, he would represent to the MSPB that he had been diagnosed with a "cannabis dependence."  *See* Navy MSPB Record Excerpts (Ex. J, Tab 2 to MSJ).

[8] If Payne had really been taking Marinol at the time of the May 31, 2006 drug test, it is curious why he would not write down that he was taking the drug on the chain-of-custody form after being told by the tester to list all medications he was taking on the form; after all, the undisputed evidence shows that Payne knew at the time of the test that Marinol could cause a positive result on a urinalysis (and he was a trained EMT).  J. Payne Depo. (Ex. B to MSJ) 80:16-22; HT 104:3-9; 99:8-10; R. 179.

knew about the age complaint.[9]  *See* MSJ (doc. 54) 27-29.  Obviously if the decisionmakers had no knowledge of Payne's EEO claim, they could not have retaliated against him for filing it.  *Id.*  Moreover, Payne's termination in December 2006 is simply too remote in time from the filing of his age complaint in February 2005 (a difference of over 22 months) to support an inference that the two events were causally connected.  *Id.* at 29.

7.     **Payne has presented no probative evidence of pretext.**

Payne has offered no evidence showing that the Army's reason for terminating him — because he tested positive for an illegal drug — is a lie.  *See Llewellyn v. Campbell Sales Co.*, 326 Fed. Appx. 388, 390 (7th Cir. May 1, 2009).  Payne's Response does nothing to contradict the undisputed facts showing that Payne tested positive for THC and failed to establish to the MRO that the positive result was caused by Marinol.  *See* MSJ (doc. 54) 23-24.  Payne claims that after the test he gave Marinol pills to Pagley and Dinsmore at a June 29, 2006 meeting at which Payne was notified of his proposed removal.  Response 17.  Again Payne cites to no evidence showing that the bottle actually had Marinol in it.  The point Payne tries to make, however, begs the question: if Payne really had Marinol pills left over in June 2006, why not produce them to the MRO, the person

---

[9] Though Payne claims that David King and Mike Miller, two of Payne's fellow firefighters, knew that Payne had filed an age complaint, neither of those men were Payne's supervisors or had any influence over the decision to terminate Payne.  Citing David King's testimony, Payne struggles to create the impression that Chief Pagley and Assistant Chief Dinsmore knew about the age complaint simply because Payne had told King about it, *see* Response 15, but King actually testified it would be "complete speculation" on his part to say whether Payne told anyone else at the fire station about it.  King Depo. (Ex. CC to Reply) 32:20-33:12.

charged with deciding whether to confirm the drug test as positive?[10]  Or for that matter, why not produce them in the MSPB proceeding or in discovery in this case?  The answer is clear, Payne could not do so because the pills did not exist.  *See* J. Payne Depo. (Ex. B to MSJ) 120:1-8; 123:17-20.

 Payne also tries to make something of Larry Ford's handwritten notes dated September 26, 2006.  *See* Ex. U to Response.  As an evidentiary matter, the Court should not consider the notes because they are unauthenticated and hearsay.  But even if they are considered, all the notes say is that "Dr. Cametas indicated that he was finally able to catch the doctor whose name was on the Marinol prescription that Mr. Payne provided" and that "[t]hat doctor indicated that he had given Eric the prescription because Eric was depressed."  Ex. U to Response.  The "prescription" referred to is simply the one that Dr. Chandler had written for Payne and which Payne filled back in *December 2004.*  R. 193.  But there has never been a dispute that Payne filled that prescription.  Neither those notes nor any other piece of evidence in this case shows that Payne was taking Marinol pills anywhere near the time of the May 31, 2006 drug test — and he could not have been because the undisputed evidence shows that Payne had run out of them over a month and a half before the test.  J. Payne Depo. (Ex. B to MSJ) 120:1-8; 123:17-20.

 If anything the September 26 notes show that Mr. Ford — the person who made the ultimate decision to terminate Payne — and the MRO earnestly tried to help Payne establish that he was taking Marinol at the time of the drug test under a valid prescription

---

[10] The fire department certainly had no role in deciding whether Payne's positive test result was caused by prescription medication.  Pagley Depo. (Ex. BB to Response) 39:8-15.

Defendant's Reply Brief — Page 14

by encouraging him to provide his medical records.[11]  According to the notes, if those records "confirmed that he [Payne] was on that drug (Marinol) under the doctor's care at the time that he provided the specimen, it would affect the positive finding report." *See* Ex. U to Response.  But as the notes show, when the MRO tried to get Payne's permission to review the records, Payne "was very short and told [the MRO] not to bother him again." *Id*.  Despite his livelihood being on the line, Payne refused to release his medical records, so the MRO confirmed the positive finding.  Larry Ford relied on the MRO's finding in deciding to terminate Payne, *see* Ford Depo. (Ex. D to MSJ) 66:1-5, and Payne cites to no evidence showing that the removal decision, even if incorrect (it was not), was made solely because of (or was even motivated by) disability discrimination or retaliation.  *See Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).

For these reasons and those raised in Defendant's Motion for Summary Judgment on Discrimination and Retaliation Claims (doc. 54), the Court should grant summary judgment in favor of Defendant and dismiss Payne's discrimination and retaliation claims with prejudice.

---

[11] The September 21, 2006 e-mail from Larry Ford that Payne cites to, *see* Ex. T to Response, shows that Mr. Ford prodded the MRO to make "extra effort" to try to get in contact with Payne's treating physician to determine whether Payne "was taking prescribed Marinol on the date that he provided the specimen." *Id*.  This is hardly any evidence that Mr. Ford was trying to concoct a phony reason for terminating Payne based on any alleged disability but rather shows that Mr. Ford conscientiously did his job to make sure that Payne was being terminated for the right reason.

Respectfully submitted,

JOHN M. BALES
UNITED STATES ATTORNEY
EASTERN DISTRICT OF TEXAS

Thomas E. Gibson
Assistant U.S. Attorney
Texas Bar No. 07875450
110 N. College, Suite 700
Tyler, Texas 75702
(903) 590-1400
(903) 590-1436 (fax)
tom.gibson@usdoj.gov

/s/
BY: Bradley Visosky
Assistant U.S. Attorney
Texas Bar No. 24034727
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 509-1201
(972) 509-1209 (fax)
bradley.visosky@usdoj.gov

ATTORNEYS FOR DEFENDANT JOHN
MCHUGH, SECRETARY OF THE ARMY

## CERTIFICATE OF SERVICE

I certify that on December 11, 2009 a true copy of this document was served on plaintiff's counsel through use of the Court's electronic notification system.

/s/
Bradley Visosky